IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| OSCAR CHICAS LOVO,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>    Defendant. | Case No. 1:22-cv-1008 |

## **COMPLAINT**

1. This civil action seeks declaratory relief and compensatory damages as a result of the wrongful and illegal detention of Plaintiff Oscar Chicas Lovo, a 55-year-old national and citizen of El Salvador granted Temporary Protected Status by the United States. Without any basis for believing Mr. Chicas Lovo was not lawfully in the United States and, in fact, with ample evidence that Mr. Chicas Lovo was authorized to be in the United States, officers from Immigration and Customs Enforcement ("ICE"), under the U.S. Department of Homeland Security, arrested and detained Mr. Chicas Lovo for nearly seven hours despite a statute that explicitly prohibits the detention of Temporary Protected Status recipients.

2. On or about February 13, 2020, ICE officers stopped Mr. Chicas Lovo's vehicle because they were targeting his son for arrest, who was a passenger. During the stop, ICE officers failed to identify themselves and broke the passenger window of Mr. Chicas Lovo's vehicle, without cause,[1] to open the vehicle's doors. Despite not being the target of the

---

[1] In a court document titled "Factual Basis" filed in Mr. Chicas Lovo's son's criminal case related to this incident, *United States v. Chicas-Marquez*, 1:10-CR-67-1, U.S. Dist. Ct., Middle Dist. N.C. (Mar. 24, 2020), United States Attorney Matthew G.T. Martin references ICE officer(s) statements that Mr. Chicas Lovo "pinned the officer's arm"

arrest, the officers dragged Mr. Chicas Lovo out of the vehicle, handcuffed him, and, after searching the vehicle without Mr. Chicas Lovo's consent, became aware that Mr. Chicas Lovo was lawfully present in the United States as evidenced by his valid REAL-ID Act compliant driver's license and his valid U.S. Department of Homeland Security-issued employment authorization document. During questioning by the ICE officers, Mr. Chicas Lovo confirmed that he was lawfully present in the United States as a beneficiary of Temporary Protected Status. The ICE officers purposefully ignored Mr. Chicas Lovo's statements and documentation, forcefully chained him, transferred him to an ICE processing office, and detained him for almost seven hours.

3. As a result, ICE officers, acting outside the scope of their authority, and in contravention of the United States' Constitution's Fourth Amendment and federal statutes governing protections for noncitizens granted Temporary Protected Status, committed negligent and intentional torts against Mr. Chicas Lovo, including negligence, false arrest, false imprisonment, assault and battery, and intentional infliction of emotional distress.

## JURISDICTION AND VENUE

4. This civil action is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*., and other federal laws for relief from commission of tortious acts. This court has jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(b)(1).

5. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Rule 57 of Federal Rules of Civil Procedure.

---

between the door and the window after the ICE officer reached into the vehicle. Mr. Chicas Lovo denies this claim. A copy of the Factual Basis is attached hereto as Exhibit E.

6. This complaint is timely under 28 U.S.C. § 2401(b) because tortious acts occurred on or about February 13, 2020; the Plaintiff filed administrative complaints with the relevant agencies of the United States of America on February 11, 2022; the agencies denied Plaintiff's claims on May 24, 2022; and Plaintiff now presents these claims on November 22, 2022. All administrative remedies have been exhausted under 28 U.S.C. § 2675(a). A copy of Plaintiff's administrative complaint and its denial are attached hereto as Exhibits A and B, respectively.

7. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and/or omissions giving rise to Plaintiff's claim occurred in this district.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1402(b) because the Plaintiff resides in this district and the acts and/or omissions complained of are in this district.

## PARTIES

9. Plaintiff Oscar Chicas Lovo is a 55-year-old national and citizen of El Salvador. He resides in Siler City, North Carolina, in Chatham County. Mr. Chicas Lovo was granted Temporary Protected Status on June 28, 2001 by the United States government and continued to have Temporary Protected Status at the time he was detained by Immigration and Customs Enforcement officers on or about February 13, 2020.

10. Defendant United States of America is being sued pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 for the tort claims in this Complaint.

## FACTS

11. Plaintiff Oscar Chicas Lovo is a citizen and national of El Salvador who migrated to the United States in 2000.

12. On March 9, 2001, the United States designated El Salvador under Temporary Protected Status due to the environmental disaster and substantial disruption of living conditions caused by several earthquakes in El Salvador that year.

13. Under 8 U.S.C. § 1254a, this designation allowed nationals of El Salvador to apply for Temporary Protected Status, which included a temporary reprieve from removal and employment authorization, if they (1) were continuously present in the United States before March 9, 2001; (2) were continuously residing in the United States before February 13, 2001; (3) were admissible as an immigrant; and (3) registered during the registration period.

14. On June 28, 2001, Mr. Chicas Lovo was deemed eligible for and granted Temporary Protected Status by the United States and continued to have Temporary Protected Status at the time he was detained by Immigration and Customs Enforcement ("ICE") officers on or about February 13, 2020. This grant of Temporary Protected Status allowed Mr. Chicas Lovo to remain and work in the United States.

15. Mr. Chicas Lovo's grant of Temporary Protected Status is evidenced by his employment authorization document, issued by the U.S. Department of Homeland Security. This document indicates on its face that it was issued under "Category: A12", which refers to 8 C.F.R. § 274a.12(a)(12). That section states, "An alien granted Temporary Protected Status under section 244 of the [Immigration and Nationality] Act for the period of time in that status, as evidenced by an employment authorization document issued by the [United States

Citizenship and Immigration] Service." A copy of Mr. Chicas Lovo's employment authorization document at the time is attached hereto as Exhibit C.

16. Mr. Chicas Lovo also holds a valid North Carolina driver's license, which was issued in compliance with the REAL ID Act, Pub. Law 109-13, as evidenced by a U.S. Department of Homeland Security-approved security marking, a star on the upper right-hand corner. 6 C.F.R. § 37.18(n). Additionally, the back of Mr. Chicas Lovo's driver's license included a restriction indicating "U.S. GOV. LEGAL PRESENCE EXP:01/04/2021". Pursuant to 6 C.F.R. § 37.11, state motor vehicle departments "may issue a REAL ID driver's license or identification card only to a person who has presented satisfactory evidence of lawful status." A copy of Mr. Chicas Lovo's North Carolina driver's license is attached hereto as Exhibit D.

A. **ICE OFFICERS UNREASONABLY SEIZED MR. CHICAS LOVO DURING THE STOP AND THEY CONDUCTED AN UNLAWFUL SEARCH OF HIS VEHICLE.**

17. On the morning of February 13, 2020, Mr. Chicas Lovo drove from his house in Siler City, NC to High Point, NC to pick up his son to carpool to their work site.

18. After picking up his son and during the drive to their work site, Mr. Chicas Lovo noticed an unmarked van following his vehicle.

19. Mr. Chicas Lovo stayed below the posted speed limit of 35 MPH by keeping his car at 30 MPH.

20. The unmarked van activated its blue lights, which caused Mr. Chicas Lovo to pull over and stop his vehicle.

21. Unknown named ICE officers, wearing vests emblazoned with the word "POLICE" but not wearing any type of uniform, exited the van and approached Mr. Chicas Lovo's vehicle. Mr. Chicas Lovo lowered the window about an inch.

22. ICE Officers 1 and 2 approached the driver side of the vehicle, while ICE Officer 3 approached the passenger side. About four other ICE officers also surrounded the vehicle.

23. Neither ICE Officers 1, 2, or 3 nor any other ICE officer identified themselves to Mr. Chicas Lovo or his son as either police officers or Immigration and Customs Enforcement officers. A copy of the Factual Basis filed in a related criminal case for Mr. Chicas Lovo's son is attached hereto as Exhibit E that confirms Immigration and Customs officers made this stop.

24. ICE Officer 1, in English, told Mr. Chicas Lovo that there was an issue with his vehicle's license plate and requested that Mr. Chicas Lovo exit the vehicle. Mr. Chicas Lovo speaks limited English, but, with the help of his son, understood that ICE Officer 1 was making statements about irregularities with the vehicle license plate. Mr. Chicas Lovo did not believe any irregularities existed and stayed in the vehicle.

25. When Mr. Chicas Lovo asserted there were no irregularities with the license plate, ICE Officers 1 and 3 attempted to open the vehicle's doors. Upon finding the doors locked, ICE Officer 1 on the driver's side asked Mr. Chicas Lovo for his driver's license.

26. Mr. Chicas Lovo lowered the driver's side window slightly to provide ICE Officer 1 with his North Carolina driver's license.

27. ICE Officer 1 immediately reached into the vehicle and tried to grab Mr. Chicas Lovo, causing Mr. Chicas Lovo to drop the driver's license. As Mr. Chicas Lovo pulled away to protect himself, he heard banging on the passenger side door and window. ICE Officer 1, who had reached into the vehicle, ordered Mr. Chicas Lovo to lower the window. Either simultaneously or soon thereafter, ICE Officer 2 moved to the passenger side and assisted Officer 3 in breaking the passenger side window. The ICE officers then reached into the

vehicle and unlocked all the doors. Pictures of the broken window of Mr. Chicas Lovo's vehicle are attached hereto as Exhibit F.

28. ICE Officer 1 on the driver's side opened the vehicle's door and grabbed Mr. Chicas Lovo's arm and twisted it, dragging him out of the vehicle. ICE Officer 1 then slammed Mr. Chicas Lovo against the vehicle and handcuffed his wrists behind his back.

29. Mr. Chicas Lovo requested a warrant for his arrest, but the ICE officers said they did not need one.

30. ICE officers, including ICE Officer 1, then searched Mr. Chicas Lovo's vehicle without his consent. ICE Officer 1 found and examined Mr. Chicas Lovo's driver's license, passport, and wallet in the vehicle. The wallet contained Mr. Chicas Lovo's employment authorization document and social security card. On its face, the valid driver's license had a star on the upper right corner, indicating that it was issued in compliance with the REAL ID Act. Additionally, Mr. Chicas Lovo's valid employment authorization document indicated that it was issued under category "A12", which meant he was granted Temporary Protected Status. Both documents indicate that the ICE officers knew or should have known that Mr. Chicas Lovo was lawfully present in the United States.

31. Notwithstanding that the driver's license document complied with REAL ID Act standards or that the employment authorization document was issued by the U.S. Department of Homeland Security, ICE Officer 1 questioned Mr. Chicas Lovo about the authenticity of his driver's license and employment authorization document. Mr. Chicas Lovo replied that his driver's license had been issued by the North Carolina Division of Motor Vehicles. When ICE Officer 1 then questioned Mr. Chicas Lovo about his employment authorization

document, Mr. Chicas Lovo stated it was valid and authorized him to work and remain in the United States under Temporary Protected Status.

32. ICE officers, including ICE Officer 1, did not explain or ask further questions about Mr. Chicas Lovo's immigration status. ICE officers did not identify any reason, nor did they ever tell Mr. Chicas Lovo of any reason, to question the validity of Mr. Chicas Lovo's documentation and the veracity of his statements. To this day, no information has been shared with Mr. Chicas Lovo as to why ICE officers unlawfully arrested and detained him that day.

**B. ICE OFFICERS HAD NO REASON TO BELIEVE THAT THE MR. CHICAS LOVO WAS UNLAWFULLY PRESENT IN THE UNITED STATES BUT DECIDED TO UNLAWFULLY ARREST AND DETAIN HIM ANYWAY.**

33. ICE officers chained Mr. Chicas Lovo's waist, hands, and feet and forced him into a van. ICE officers then drove Mr. Chicas Lovo to a nearby parking lot and transferred him to a different vehicle. ICE officers did not provide Mr. Chicas Lovo with any information, verbally or through a document, explaining why his arrest was justified.

34. Without identifying themselves, or providing any more information about this arrest or detention, ICE officers drove Mr. Chicas Lovo to an office building where they interrogated him and kept in chains for approximately **six to seven hours**. Only after seeing Immigration and Customs Enforcement signs and logos in the office building did Mr. Chicas Lovo know these officers were employed by the federal government.

35. Still in shackles, ICE officers fingerprinted and photographed Mr. Chicas Lovo, questioned Mr. Chicas Lovo about his biographical information and immigration history, and falsely accused Mr. Chicas Lovo of buying a fake driver's license without identifying any reason to believe that his REAL ID Act-compliant license appeared fake.

36. During the six to seven hours, he was held in the ICE processing office, Mr. Chicas Lovo was not allowed to make a call to his spouse; he was allowed to use the bathroom, but only in shackles and under the watch of an ICE officer; and he was not provided food.

## C. AFTER ALMOST SEVEN HOURS, ICE OFFICERS FINALLY RELEASE MR. CHICAS LOVO BUT DROP HIM OFF FAR AWAY FROM HIS VEHICLE.

37. At approximately 5:45pm, ICE officers, including ICE Officer 1, transported Mr. Chicas Lovo in a van, continuing to keep him in shackles. Without explanation, Mr. Chicas Lovo was finally liberated from the shackles and released in Greensboro, about twenty to twenty-five minutes from the location of his original stop and where his vehicle was located.

38. The ICE officers returned his phone and his wallet. ICE Officer 1 told Mr. Chicas Lovo that he was "lucky" to be getting away because he had Temporary Protected Status, but that they would deport his son anyway.

39. Mr. Chicas Lovo was so physically exhausted, especially after almost seven hours of having his hands and feet chained together, that he trembled and struggled to walk to a nearby gas station to find the address where he was released. After he obtained the address of the gas station, he called his wife to pick him up.

40. Since the incident, Mr. Chicas Lovo suffers from anxiety and distress due to the encounter, which causes him difficulty sleeping and makes him anxious when he interacts with or even sees law enforcement officers, as well as when he is reminded of the incident through visual or auditory vestiges.

41. ICE officers had no discretion or authority under the law to detain Mr. Chicas Lovo, who was lawfully present in the United States, for immigration purposes or criminal enforcement.

42. ICE officers are not protected from claims by the discretionary exception under the Federal Torts Claims Act.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### TORTIOUS CLAIM OF FALSE ARREST AND IMPRISONMENT UNDER THE FEDERAL TORTS CLAIM ACT 28 U.S.C. § 1346

43. The foregoing allegations are repeated and incorporated by reference as though fully set forth herein.

44. Mr. Chicas Lovo asserts a claim pursuant to 28 U.S.C. § 1346 for tortious false arrest and false imprisonment.

45. ICE officers, acting under the scope of employment under the United States of America, intentionally and unlawfully deprived Mr. Chicas Lovo of his liberty by handcuffing and restraining Mr. Chicas Lovo for an appreciable period of time.

46. ICE officers arrested Mr. Chicas Lovo without probable cause.

47. Mr. Chicas Lovos never consented to ICE's arrest and restraint of him.

48. ICE officers were aware Mr. Chicas Lovo was granted Temporary Protected Status when restraining him and therefore knew Mr. Chicas Lovo was not subject to Immigration and Customs Enforcement's arrest authority.

49. ICE officers did not release Mr. Chicas Lovo from his restraints despite seeing proof of his Temporary Protected Status, binding him physically and limiting Mr. Chicas Lovo's movements.

50. ICE officers kept Mr. Chicas Lovo handcuffed and restrained while interrogating him.

51. ICE officers detained and continued to hold Mr. Chicas Lovo in an Immigration and Customs Enforcement processing office for six or seven hours without probable cause.

52. Upon information and belief, ICE officers were employed by Immigration and Customs Enforcement, an agency under the U.S. Department of Homeland Security, when they falsely arrested and falsely imprisoned Mr. Chicas Lovo.

## SECOND CLAIM FOR RELIEF
## TORTIOUS CLAIM OF ASSAULT AND BATTERY UNDER THE FEDERAL TORTS CLAIM ACT 28 U.S.C. § 1346

53. The foregoing allegations are repeated and incorporated by reference as though fully set forth herein.

54. Mr. Chicas Lovo asserts a claim pursuant to 28 U.S.C. § 1346 for assault and battery.

55. ICE officers, individually and as officers of the United States of America, intentionally and unlawfully assaulted and inflicted bodily harm against Mr. Chicas Lovo by, among other things, (1) physically attempting to grab Mr. Chicas Lovo through the passenger window while Mr. Chicas Lovo attempted to provide his identification as requested by the officers, (2) shattering the passenger window to forcefully unlock the doors to Mr. Chicas Lovo's vehicle in order to seize him, (3) brutally grabbing Mr. Chicas Lovo and dragging him out of the vehicle; (4) slamming Mr. Chicas Lovo against the vehicle; (5) forcefully handcuffing Mr. Chicas Lovo's wrists; and (6) chaining Mr. Chicas Lovo's hands and feet together for almost seven hours.

56. Upon information and belief, the ICE officers were employed by Immigration and Customs Enforcement, an agency under the U.S. Department of Homeland Security, when they unlawfully assaulted and battered Mr. Chicas Lovo.

## THIRD CLAIM FOR RELIEF
## NEGLIGENCE UNDER THE FEDERAL TORTS CLAIM ACT 28 U.S.C. § 1346

57. The foregoing allegations are repeated and incorporated by reference as though fully set forth herein.

58. ICE officers, as officers of the United States of America, breached their duty of reasonable care by negligently acting or failing to act in such a way that proximately resulted in Mr. Chicas Lovo's wrongful detention by Immigration and Customs Enforcement, which the ICE officers knew or should have known posed a substantial risk of grave harm to Mr. Chicas Lovo.

59. ICE officers, including any supervisory personnel, were negligent in performing their duties and failed, neglected and/or refused to properly and fully discharge their responsibilities by, among other things:

    i. Failing to recognize Mr. Chicas Lovo's valid documentation, which indicated Mr. Chicas Lovo was lawfully present in the United States, particularly because he was granted Temporary Protected Status;

    ii. Disregarding Mr. Chicas Lovo's statements that he was lawfully present in the United States under Temporary Protected Status;

    iii. Failing to recognize that Mr. Chicas Lovo's claims were supported by additional documents found in his vehicle, including his passport, which indicated he was a citizen or national of El Salvador;

    iv. Failing to adequately train and supervise personnel performing these duties on the protections provided by the law to persons under Temporary Protected Status; and

    v. Detaining and holding a noncitizen granted Temporary Protected Status.

60. Upon information and belief, ICE officers were officers of Immigration and Customs Enforcement, an agency of the U.S. Department of Homeland Security, and were employees of the United States of America when they committed these acts.

61. As a direct and proximate result of ICE officers' conduct, including any supervisory personnel, Mr. Chicas Lovo has suffered and continues to suffer damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER THE FEDERAL TORTS CLAIM ACT 28 U.S.C. § 1346**

62. The foregoing allegations are repeated and incorporated by reference as though fully set forth herein.

63. Mr. Chicas Lovo asserts a claim pursuant to 28 U.S.C. § 1346 for intentional infliction of emotional distress.

64. The conduct of the ICE officers, including ICE Officers 1 and 2, went beyond reasonable human decency when the ICE officers, without legal authorization or justification, forcefully removed Mr. Chicas Lovo from his vehicle, shackled him, drove him to an unknown location, and imposed further fear by interrogating him for almost six to seven hours straight.

65. The ICE officers demonstrated a reckless indifference to the likelihood that their extreme and outrageous conduct of unlawfully detaining Mr. Chicas Lovo for almost seven hours would cause Mr. Chicas Lovo severe emotional distress.

66. The ICE officers' extreme and outrageous behavior did cause Mr. Chicas Lovos severe emotional distress.

67. The ICE officers acted beyond reasonable human decency when they kept Mr. Chicas Lovos unlawfully detained, without food, and denied him privacy even while he used the bathroom, and released him far away from the site of his unlawful arrest, with no aid or information as to how to return to his vehicle.

68. The ICE officers' extreme and outrageous conduct caused Mr. Chicas Lovos anxiety that started immediately after the unlawful arrest and detention and still continues to affect Mr. Chicas Lovo when he thinks about the incident or is reminded of it by someone else talking about it or even from the sight of law enforcement officers.

69. Mr. Chicas Lovo now takes medication to help control his anxiety because he has not been able to control it, and is constantly assaulted by memories of the ICE officers' extreme and outrageous behavior.

70. The ICE officers' extreme and outrageous behavior caused Mr. Chicas Lovo to suffer from insomnia and sleep anxiety, which causes him to have both problems falling asleep and associated anxiety of sleeping because of the nightmares that still continue and were caused by the ICE officers' extreme and outrageous behavior of unlawfully detaining and interrogating him for almost seven hours.

71. Mr. Chicas Lovo sweats, shakes, has increased anxiety, and his motility and excrementary functions are impaired and otherwise affected when he is reminded of or thinks about the ICE officers' extreme and outrageous behavior.

72. Upon information and belief, the ICE officers were employed by Immigration and Customs Enforcement, an agency under the U.S. Department of Homeland Security, when they committed these negligent acts or omission against Mr. Chicas Lovo.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment against the Defendant and grant the following relief:

1. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the Immigration and Customs Enforcement officers' seizure, detention, search, and questioning of Plaintiff were a clear violation of Plaintiff's Fourth Amendment rights;

2. An order awarding the Plaintiff compensatory damages, including but not limited to: lost wages, repair cost for vehicle window, costs for future therapy, medical care and associated costs for medication, emotional pain and suffering, and loss of enjoyment of life, under 28 U.S.C. § 1346(b)(1), in an amount to be proven at trial; and

3. Such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on any and all issues triable by a jury.

Respectfully submitted this 23 day of November, 2022.

/s/ C. Scott Holmes

NORTH CAROLINA CENTRAL UNIVERSITY
SCHOOL OF LAW
Civil Litigation Clinic
Bar No. 25569 (North Carolina)
640 Nelson Street
Durham, NC 277707
Tel. No. (919) 530-7463
Fax No. (919) 530-7982
Email: scott.holmes@nccu.edu
Attorney for Plaintiff

/s/ Adriel D. Orozco
NORTH CAROLINA JUSTICE CENTER
Bar No. 149532 (New Mexico)
224 S. Dawson Street (27601)
P.O. Box 28068
Raleigh, NC 27611
Tel. No. (919) 863-2401

Fax No. (919) 856-2175  
Email: adriel@ncjustice.org  
Attorney for Plaintiff

/s/ Carlene McNulty  
NORTH CAROLINA JUSTICE CENTER  
Bar No. 12488 (North Carolina)  
224 S. Dawson Street (27601)  
P.O. Box 28068  
Raleigh, NC 27611  
Tel. No. (919) 856-2161  
Fax No. (919) 856-2175  
Email: carlene@ncjustice.org  
Local Civil Rule 83.1(d) Counsel for Plaintiff